Argued October 14; affirmed November 10, 1938

## ALDRICH *v.* LADD & BUSH TRUST CO. ET AL.
### (84 P. (2d) 116)

*Mark V. Weatherford* and *A. K. McMahan,* both of Albany, for appellant.

*E. M. Page* and *Custer E. Ross,* both of Salem, for respondents.

BAILEY, J.   This suit was instituted by Lucile Aldrich against Ladd & Bush Trust Company, a corporation, executor of the last will and testament of T. B. Jones, deceased, and the sons, daughter and their re-

spective spouses, and grandchildren of the decedent, T. B. Jones, for a decree declaring that plaintiff is the owner and entitled to the possession of certain real property in Wallowa county, and a certain Nash automobile, and that certain business property in Salem be charged with payment to plaintiff of $50 a month during her lifetime.

The complaint alleges that during the spring of 1935 and for some time prior thereto T. B. Jones was acquainted with plaintiff and was very fond of her companionship; that he had confidence in her integrity and devotion to him, "and he offered and promised to and with the plaintiff that if the plaintiff would become" his "nurse, companion and confidential secretary * * * for the remainder of his life and devote her time, devotion, companionship and skill to his comfort and provide her services in that behalf for his comfort and enjoyment that he * * * would will and convey to the plaintiff" his 1934 Nash automobile, would provide for her during her natural life an allowance of $50 a month from the income of certain designated business property in the city of Salem then owned by T. B. Jones, and would will and convey to plaintiff certain described land in Wallowa county, consisting of 280 acres, and that in addition thereto the said T. B. Jones would erect and construct a dwelling house on said Wallowa county property "suitable to the plans and wishes of the plaintiff", which house would cost substantially $3,000.

It is further alleged that the plaintiff accepted the said offer and fully complied with all the terms and conditions of the agreement on her part to be performed; that plaintiff at the instance and request of T. B. Jones took a course of instruction in preparing diets and administering medicine for the purpose of

being enabled "to better serve and provide for the comfort of the said T. B. Jones"; that plaintiff proceeded to and did devote all her time as a nurse, companion and confidential secretary to the said T. B. Jones during the remainder of his life; and that the said Jones accepted said services of the plaintiff "in full performance and compliance with the said terms of the contract."

The complaint avers that the services rendered by the plaintiff "were of such a nature that the same could not be hired or paid for in money, but depended upon the mutual affection, sympathy and companionship which existed between the plaintiff and the said T. B. Jones and it was not intended by the said T. B. Jones or by the plaintiff herein that the same should be paid for or valued in money". It is next stated that T. B. Jones was prevented from carrying out his part of the agreement after the services had been rendered by the plaintiff, by the acts of certain of the named defendants, who "prevented the said T. B. Jones from executing said instruments at and when he was confined to a hospital during his last illness though at all times the said T. B. Jones was ready, able and willing to do so and would have done so but because of his enfeebled condition and confinement to a hospital was unable to circumvent the designs and acts of certain of the defendants herein."

The allegations of the complaint as to a contract between the plaintiff and T. B. Jones and performance thereof by the plaintiff were denied by the answer. From a decree of the circuit court in favor of the defendants the plaintiff has appealed.

T. B. Jones died testate May 18, 1936, in a hospital in Portland, Oregon, where he had been a patient since January 8 of that year. At the time of his death he

was 79 years of age. He left surviving him as heirs at law, two sons, one daughter and the children of a deceased son, all of whom are residents of Marion county. The wife of the decedent died on December 31, 1934, after an extended illness of almost two years.

The estate of T. B. Jones at the time of his death consisted of real property appraised in excess of $100,000 and personal property appraised in excess of $185,000. His real property holdings comprised one farm of 280 acres in Wallowa county appraised at $17,120, which is the property here involved, three farms in Marion county, occupied by his sons and daughter, and business and residential property in Salem, including lots 1 and 2 in block 50 in the city of Salem, appraised at $30,000, upon which lots the plaintiff seeks to impress a trust for the payment of $50 monthly to her during her lifetime.

The alleged contract which the plaintiff seeks to enforce was, according to her testimony, entered into during the latter part of May, to the best of her recollection, while the plaintiff and the decedent were at the latter's beach cottage at Neskowin, Oregon. Before going into this alleged contract in detail, however, we shall revert to the events preceding its making.

In April, 1934, Mrs. Viesko, the daughter of T. B. Jones, inserted an advertisement in one of the Salem newspapers for a domestic servant to be employed at her farm home, some 12 miles from Salem. The plaintiff, a widow approximately 24 years of age, with her daughter of about four years, was living with the plaintiff's sister in Salem and made application for the position, but did not take it because of not wanting to be so far away from the city. She was then unemployed, although she had previously been employed elsewhere

as a waitress and as a housemaid. Later, about June 1 of the same year, T. B. Jones was also in need of a housemaid and Mrs. Viesko got in touch with the plaintiff, who eventually was employed in that capacity by Mr. Jones at his home in Salem. The plaintiff worked in his home for about three or four weeks, when she became ill. At the time that the plaintiff began working for T. B. Jones the latter's wife was ill and had a special nurse.

Mr. Jones had for some 24 years been afflicted with diabetes and in 1928 the amputation of one of his legs was necessitated by that disease. He had provided himself with an artificial limb and was able to get around and to drive his automobile. However, from the time of the amputation of the limb he had been adhering to a special diet and was obliged to take insulin treatments twice a day, morning and evening. The plaintiff, while at the Jones home as a domestic in June, was taught by Mrs. Viesko, who had taken a course in dietetics and had been instructed in administering insulin, how to prepare food for Mr. Jones. The evidence is in conflict as to whether or not, during this period, the plaintiff actually administered insulin to Mr. Jones.

When she became ill the plaintiff went to her sister's home in Salem, where she stayed for about two weeks, and then went to her parents' home at Brownsville, where she remained more than a month, and thereafter returned to her sister's home. During the time that she was at her sister's home, Mr. Jones telephoned the sister a number of times, to ask how Mrs. Aldrich was getting along, and called in person at the sister's home. He also wrote the plaintiff two or three letters while she was at her parents' home and called her by long distance telephone.

After the plaintiff left the Jones residence in the latter part of June, Mr. Jones procured as a housekeeper Miss Minnie Crooks, who remained in his home as such housekeeper until after his death. To her was assigned the duty of preparing his diet and administering the insulin. A grandson of Mr. Jones made his home with him for a good many years prior to Mr. Jones's death and assisted in caring for him.

In October, 1934, Mr. Jones and the plaintiff, accompanied by her daughter, went to the Jones cottage at Neskowin, where they stayed for a few days, and the plaintiff testifies that while there she administered the decedent's insulin treatments and prepared his diet. The preponderance of the evidence is to the effect that no further trips were made by the plaintiff and the decedent to Neskowin until May, 1935.

From the time that the plaintiff returned to Salem from her parents' home, she was hired by Mr. Jones to drive him about in his car to some extent, up to some time in April, 1935, when he had a heart attack and was incapacitated for a short period. Because of that attack he was advised by his physician not to drive his car any more, and he did not thereafter drive it much.

In the latter part of May, 1935, after his recovery from the heart attack, and over the protest of his daughter and the grandson who lived with him, Mr. Jones, accompanied by the plaintiff and her young daughter, went in the decedent's car, which Mrs. Aldrich drove, to the decedent's beach cottage, where they stayed for a week or ten days. It was there, according to the plaintiff, that she and Mr. Jones entered into the contract which is here attempted to be enforced. The making of the alleged contract resulted, according to the plaintiff's testimony, from an incident that she described as ''a little unpleasantness with him one evening

at Neskowin'', after which she told him that they would return to Salem the next morning. She further testified in this connection:

"At this time he begged me to stay and I told him no, I wasn't working for him any more, and this is the time he made the contract with me  *   *   *.

"I told him he could hire some one else to work for him, that I was through, and he was crying and begged me to stay with him, he said he needed some one to take care of him and some one he could depend on and some one he cared to have with him and if I would do this until his death, he would give me, at his death, this Wallowa county farm, this fifty dollars a month income from the property and his car.''

The plaintiff did not, she stated, promise that evening that she would remain in the employ of Mr. Jones, "and the next morning  *   *   *  at the breakfast table he asked me what I had decided, and I told him very definitely if he would behave himself and would fix this property for me and give me the car and fifty dollars a month income the rest of my life I would, but under no other circumstances I wouldn't.'' When asked what Mr. Jones said to this, she answered: "He promised faithfully he would do so.''

In substantiation of the plaintiff's claim that such a contract was entered into between her and the decedent, the plaintiff on this appeal directs attention to certain testimony given by her parents, her sister and a friend. The sister testified that Mr. Jones in referring to building a house on the Wallowa ranch "always called it Lou's house,—Lou's farm''; that the decedent was very fond of the plaintiff; that "he wanted her well provided for after he was gone''; that "he said he had fixed for her so she would be well provided for''; and that "he always referred to his automobile as Lou's car''. The plaintiff's mother testified that when

she was at Neskowin visiting Mr. Jones, and the plaintiff and others were also guests of the decedent, there was some discussion concerning the building of a house at the Wallowa county farm. She thus detailed the conversation:

"The only thing I remember clearly, he called to her [the plaintiff] and said, 'Lou, do you want a fireplace or don't you', he said, 'you know I am building it for you', but how they ended it I don't know."

She further testified that Mr. Jones stated that he thought Mrs. Aldrich ought to have a home for herself and her little daughter, "and he had provided that she would". The attention of this witness was called to a statement made by her to the effect that Mr. Jones "had a contract with Lou". In explanation of that statement, she testified:

"I can't just exactly remember how it was said, but the outcome was, I was talking to him about having both Minnie and Lou employed, I said something about that, and he—I don't just remember how he stated it, only he mentioned they had a contract between them, but he didn't say what and I didn't ask him."

The plaintiff's father, when asked whether or not Mr. Jones had said anything about the disposition of his property, answered, "Nothing,—well, his property —he said he was going to leave Lucile well fixed so she could have a home for her and her little girl and plenty to live on the rest of her life."

Mrs. Kayser, a friend of the plaintiff, testified that at one time when she and others started to get into Mr. Jones's car, the decedent remarked, "Lou's car sure is dirty", and also said, "We went up to our ranch * * * and we had the basement dug and poured * * * We are going back in the spring and build the house * * * The house is going to be just the same

as the house at Neskowin, except a few changes Lou had made.''

After returning to Salem from Neskowin during the latter part of May or early in June, 1935, subsequent to the alleged making of a contract, the plaintiff continued, whenever requested by Mr. Jones, to drive his car wherever he wished to be taken. She testified that they made frequent trips to Mr. Jones's cottage at Neskowin during the summer and fall of 1935, but she was unable to state how many times or the approximate dates when those trips were made, with the exception of a visit at the beach over Thanksgiving, when Mr. Jones had as guests some of his children and grandchildren and the plaintiff's parents.

At no time subsequent to June, 1934, did the plaintiff live in the Jones home in Salem, except after Mr. Jones went to a Portland hospital in 1936, under circumstances later to be detailed.

In support of her assertion that she had a contract with Mr. Jones such as she claims and that she fully performed her part of it, the plaintiff has directed our attention to the fact that she twice accompanied Mr. Jones and drove his car from Salem to the Wallowa county farm; that on the first trip they remained two or three days at a hotel at Enterprise; and that on the second trip they rented a furnished house at Joseph, where they stayed three weeks. Concerning the first trip she also testified that although she did not prepare Mr. Jones's meals she gave directions to the hotel kitchen concerning his diet. She did, however, prepare his meals, she testified, on the second trip to the farm.

On the latter visit to the Wallowa county property, she further testified, the basement for the new house was excavated and concrete for the foundation was

poured. The plaintiff claims that she was consulted at all times concerning the building of this house.

Late in October or early in November, 1935, Mr. Jones, accompanied by the plaintiff, went by train to Minneapolis to procure a new artificial leg or to have the old one adjusted. They were gone several weeks and returned by way of California. During this trip the plaintiff did not do anything toward the preparation of the decedent's diet, although she does claim that she assisted him in the selection of proper food for him to eat.

The plaintiff testified that after the alleged contract was entered into she was on a number of occasions at the decedent's home during the evening, and that she then administered insulin to him and helped him to take off and replace his artificial limb.

Much of the testimony given by the plaintiff as to what she did for Mr. Jones after the alleged making of a contract is specifically denied by one or more witnesses. The complaint alleges that Mr. Jones was prevented from providing for the plaintiff by will or deed by the action of certain of the defendants at the time when he was confined to a hospital during his last illness. No attempt was made to prove those allegations of the complaint. In fact, the plaintiff's own evidence is to the contrary. She testified that shortly after their return from the beach she had driven Mr. Jones to the office of his lawyer for the purpose, as expressed by the decedent, of preparing the necessary papers for carrying out his agreement with her, and that after leaving the lawyer's office he stated that he had executed the necessary papers. Mr. Jones lived only a few blocks from his attorney's office, and from the first of June, 1935, until he went to the hospital in January,

1936, he frequently passed the building where the office was located, sometimes walking unaccompanied and at other times taken in his car by the plaintiff.

As proof of the existence of a contract between her and Mr. Jones, the plaintiff points to the evidence in the record to the effect that Mr. Jones had referred to the Wallowa county farm as hers after his death and had said that he was building the house thereon according to her wishes. The defendants, however, called numerous witnesses who lived near the Wallowa county farm, and several of them testified that Mr. Jones had contemplated building a house on this farm as early as 1933 and had told them that he expected to build it according to the plan of his Neskowin cottage.

On the second trip made to the farm by the plaintiff and Mr. Jones in 1935, the plans for the house were discussed by the decedent with the Gelsinger family on numerous occasions. The elder Gelsinger helped to set the forms and pour the concrete for the basement and was around the house and farm a good deal of the time. It appears then to have been understood by Mr. Jones and the Gelsinger family that the property was to be leased to Guy Gelsinger and that the house was to be occupied by his son, who was to be married soon and live on the place. Contrary to the testimony of plaintiff, these various witnesses testified that she did not, in their presence at least, have anything to say about how the house was to be built and did not show any interest in the farm.

On the day when Mr. Jones expected to have his second foot or leg amputated, he telephoned to Salem and requested his attorney to come to his bedside. There in the presence of the attorney and Mr. Jones's children, according to their testimony, Mr. Jones stated that he wanted the farm leased to Mr. Gelsinger and that

he would like him given a long lease, for the reason that when he had formerly rented the property he had proved to be a good tenant.

An incident in connection with the plaintiff's first visit to the farm with the decedent is significant. The plaintiff testified that she instructed the hotel management how she wanted Mr. Jones's food prepared, and that the hotel kitchen was equipped with scales with which his food was weighed. This was specifically denied by Mrs. Cayton, in charge of the hotel, who stated that there were no scales in the kitchen and that she had advised Mrs. Aldrich that she might, if she so desired, go to the kitchen and prepare Mr. Jones's food for him, but Mrs. Aldrich declined to do so and the food was prepared by members of the hotel staff in the manner in which they had prepared Mr. Jones's diet in the past.

During the month of June, 1934, Mrs. Aldrich was employed steadily as a housemaid in the Jones home and was paid wages on a monthly basis for her services during that time. After her illness she was not steadily employed by Mr. Jones, but acted as his chauffeur whenever he required. According to her statement, from the time when she began to drive his car for him, Mr. Jones did not pay her any wages at all, but merely gave her expense money and small sums for her personal needs. The same arrangement was continued, according to her statement, after the alleged contract was made. She did not have any idea how much money she received from Mr. Jones between October, 1934, and the first of June, 1935, for expenses and personal needs, and she had no idea how much money he gave her after the latter date. The testimony of Minnie Crooks, the housekeeper, and Herbert Jones, decedent's grandson, is to the effect that Mr. Jones

paid her each time he called upon her to drive the car for him.

Mr. W. D. Carter, who was renting what is known as the Nash garage from Mr. Jones, stated that during the decedent's last confinement to the Portland hospital he, the witness, returned to Salem from Portland with the plaintiff and Fred Viesko, son-in-law of Mr. Jones, and that during the trip Mrs. Aldrich was discussing with Mr. Viesko the apparent ill feeling the latter's wife had toward her. Mr. Carter thus related the conversation:

"Well, we were riding along somewhere between here and Portland, and Mrs. Aldrich made the statement she was sorry Mrs. Viesko was mad at her, she never expected anything from Mr. Jones outside of her salary and never wanted anything and never asked anything."

The record also contains testimony of a number of witnesses to the effect that the plaintiff admitted during Mr. Jones's last illness that he did not owe her anything. After such testimony was given, the plaintiff on rebuttal was asked if she had ever mentioned to Minnie Crooks that she "had wages coming", to which she replied: "I may have mentioned wages to her at some time, to the effect that I needed some money, or something, for the simple reason that Mr. Jones told me not to say anything to anybody otherwise but what I did have wages coming." Questioned, "Why did he tell you that?" Mrs. Aldrich explained: "Because he didn't want his children to know anything about this contract." The plaintiff also stated to a number of witnesses, according to their testimony, that she never expected anything but salary, or that she did not expect anything from Mr. Jones's estate.

On February 5, 1936, Mr. Jones made out a check in favor of the plaintiff in the sum of nine dollars, and on the back of the check, at the top, wrote the word "work". The plaintiff placed her endorsement thereunder and cashed the check. She admitted that she must have read the notation when she received the check, but did not give any satisfactory explanation consistent with her contention that she was not being paid for her services.

The decedent's attorney testified that after proceedings had been instituted for the probate of the decedent's will the plaintiff came to his office and made a request that she be paid $500 as salary, claiming that salary was due her for five months at the rate of $100 a month. A day or two later, an attorney of Salem purporting to represent the plaintiff also appeared at the office of decedent's attorney to press the payment of Mrs. Aldrich's claim for $500. The plaintiff admits that after she read in the newspapers that the will had been filed for probate and noted the details printed concerning the terms of the will, she did go to the office of decedent's attorney. She testified that she then made no demand for salary due but asked only if any provision had been made for her in the will. In this regard she gave the following testimony:

"I went in to him and asked him if Mr. Jones had not provided for me in his will, and he answered me he had not ever mentioned me to him whatever.

"Q. Did you say anything to him about the payment of salary, five months at $100 a month? A. I did not, I wasn't even there long enough."

The plaintiff admitted that she consulted an attorney concerning her claim against the decedent's estate. She testified that she stated to that attorney that

she had a contract whereby the decedent was to give her certain property, but the attorney advised her that it would be better to put in a claim for wages. She further testified that she had not authorized that attorney to make a claim to the decedent's attorney for wages. The attorney whom she consulted, however, was not called as a witness.

Miss Minnie Crooks was the housekeeper in Mr. Jones's home from about July 1, 1934, until after his death. She testified that after her employment as such housekeeper began the plaintiff did not, except once, prepare a meal for Mr. Jones in his Salem home, and that was upon their return from Minneapolis. At no time, according to Miss Crooks and relatives of the decedent, did Mrs. Aldrich administer insulin to Mr. Jones at his home in Salem while they were present, after June, 1934. The plaintiff's statement that she had at numerous times assisted Mr. Jones in removing and replacing his artificial limb in his home after their return from Minneapolis and that he was unable to put it on or take it off alone is flatly denied by Miss Crooks and the decedent's immediate relatives. Miss Crooks was married in June, 1936, and at the time of the trial was living in California.

During the fall of 1935 Mrs. Aldrich was employed, as in past years, at the state fair grounds during fair week. She was also employed for a short time in a restaurant in Salem. She does not appear to have devoted her time exclusively to Mr. Jones and his comfort or to have changed her position or mode of living after allegedly entering into contractual relations with the decedent.

Mr. Jones was taken to a Portland hospital January 8, 1936. On or about March 9 or 10 of the same year his remaining leg was amputated. He died, as herein-

before stated, on May 18 of that year. Shortly after he went to the hospital he told his grandson to allow Mrs. Aldrich to stay in his home, where the grandson and Miss Crooks remained, while she was looking for employment. She remained there until the house was closed about March 18, 1936. Mrs. Aldrich, however, did no work in or about the house. She made a number of trips to see Mr. Jones up to the time of the second amputation, but did not thereafter visit him. She claims that the reason for her not seeing him after that operation was that certain of his relatives protested against her presence, and that they were afraid that she would take advantage of his generosity. The decedent's daughter and other relatives to whom the plaintiff referred gave other and credible reasons, however, for not wanting Mrs. Aldrich to visit the decedent.

The last will and testament of T. B. Jones was executed by him on March 3, 1935. By this will he made certain small bequests, devised a life interest to his sons and daughter in the respective farms they were then occupying, with remainder over to their children, and left the balance of his property in trust. Before executing this will, Mr. Jones had it gone over carefully by his trustee and spent a week or more in studying it himself. The will was executed prior to the alleged making of a contract between Mr. Jones and the plaintiff. At no time did Mr. Jones, according to his attorney's testimony, request that the will be changed in any particular. In fact, Mr. Jones made the statement a number of times that he had spent a good deal of time in preparing the will and did not intend to change it. The attorney to whom the plaintiff says she took Mr. Jones for the purpose of preparing the necessary documents to carry out his agree-

ment with her testified definitely and emphatically that Mr. Jones at no time mentioned any agreement between himself and the plaintiff, and that at no time did he request the attorney to prepare any documents whereby provision should be made for Mrs. Aldrich after the death of Mr. Jones.

Many witnesses were called who testified that Mr. Jones was a man of sterling qualities, that he was a good business man, and that he had the highest possible reputation for honesty, integrity and keeping "his pledged word".

The transcript of testimony contains more than five hundred pages of testimony, and it is impossible to recount here the statements of all the witnesses. We are of the opinion that the plaintiff has failed to prove by clear, convincing and satisfactory evidence that the alleged contract upon which she relies was ever entered into between herself and the decedent: *Losey v. O'Hair, ante* p. 63. We are also of the opinion that it was never contemplated that the plaintiff was to receive anything but wages for the services which she performed for Mr. Jones. As already stated, much of the testimony which the plaintiff gave is contradicted by other witnesses, many of them disinterested.

The circuit court seems to have reached the logical and only proper conclusion upon the evidence submitted in this case. The decree appealed from is therefore affirmed.

RAND, BELT and LUSK, JJ., concur.